[No. 74283-9. En Banc.]
Argued May 25, 2004. Decided September 9, 2004.

LEONIDA DEL ROSARIO, *Petitioner*, v. GENE DEL ROSARIO, ET AL., *Respondents*.

Terry E. Lumsden (of Law Offices of Terry E. Lumsden) and Howard M. Goodfriend (of Edwards, Sieh, Smith & Goodfriend, P.S.), for petitioner.

Marilee C. Erickson (of Reed McClure) and David H. Middleton, for respondents.

Bryan P. Harnetiaux and Debra L.W. Stephens on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

CHAMBERS, J. — A non-English speaking passenger in a motor vehicle accident seeks to avoid a release she signed that was written in English, prepared by an insurance adjuster, and translated by her sister-in-law who is one of the defendants. In Finch v. Carlton, 84 Wn.2d 140, 524 P.2d 898 (1974), this court created a special exception to general contract principles governing the enforceability of personal injury releases. Now, we must decide whether the Finch "fairly and knowingly made" exception extends to all personal injury releases. We conclude that the Finch exception applies only to unknown or latent injuries.

Also at issue is whether a new test announced by Division One of the Court of Appeals should be applied to determine the validity of releases written in English and signed by someone who does not read English. The court below concluded that a non-English reading person should be able to set aside a release upon a finding that "he or she reasonably relied on another's erroneous translation or

explanation of it." *Del Rosario v. Del Rosario*, 116 Wn. App. 886, 898, 68 P.3d 1130 (2003), *review granted*, 151 Wn.2d 1001, 87 P.3d 1184 (2004). We recognize that some avenue for relief may be appropriate, particularly as here, where all parties knew that a signatory could not read English and another party to the agreement undertook to interpret the agreement for the non-English reading party. However, the test announced by the Court of Appeals was not presented to the trial court and was not adequately briefed or argued by the parties. Therefore, we decline to reach the merits and to adopt the new rule in this case.

We remand for trial the issue of whether the release should be set aside based upon traditional contract principles raised by the parties at trial including fraud, misrepresentation, overreaching, and undue influence.

## FACTS

Leonida Del Rosario was injured in a motor vehicle accident on March 3, 1997. At the time of the accident, she was a passenger in a vehicle driven by her brother-in-law, Gene Del Rosario. Gene[1] was the at-fault driver. At the time of the accident, Gene and his wife, Priscilla Del Rosario, were insured by State Farm Mutual Automobile Insurance Company (State Farm). Their policy included third party liability coverage as well as first party personal injury protection (PIP) coverage.

According to Leonida, her injuries included a fractured patella, a laceration above the eye and on her forehead, back and neck pain, and bruises on her arm and shoulder.[2] Two days after the accident, Leonida received a letter from State Farm informing her of the PIP benefits available to her as a passenger in Gene's car. Because Leonida does not speak or read English, her daughter, Mary Lou Del Rosario,

---

[1] The parties will be referred to by their first names to avoid confusion.

[2] The parties do not dispute the nature or extent of Leonida's injuries. Nor does Leonida claim that she suffered from any unknown or latent injuries at the time her release was executed.

who handles the family's mail and bookkeeping, explained the letter and filled out the application for PIP benefits. Leonida signed the application and it was returned to State Farm a week after the accident.

Due to her injuries, Leonida was unable to return to work as a housekeeper at a convalescent home for approximately six weeks. Within the first two weeks after the accident, Leonida began to worry about her family's ability to pay bills without her income. Leonida contacted Priscilla and wanted to know "who is going to foot the bill for this accident." Report of Proceedings (RP) (Apr. 3, 2002) at 53. As a result, Priscilla contacted their insurance agent and was referred to Scott Kimbro, a third party liability claims adjuster at State Farm. Leonida's PIP benefits were handled by a different adjuster.

Approximately three weeks after the accident, Gene, Priscilla, Leonida, and Erlinda Soriano, who is Gene's sister and who was also a passenger in the vehicle at the time of the accident, went to the State Farm offices. Leonida's daughter, Mary Lou, did not accompany the party to the State Farm offices. While Gene dealt with someone else regarding the damage to his vehicle, the three women met with Kimbro. Both Priscilla and Soriano speak English. Priscilla translated the conversation with Kimbro for Leonida, who speaks only a particular Philippine dialect.

Kimbro negotiated settlements with each of the women for their liability claims. Priscilla testified that she relayed Leonida's major concern for her lost wages to Kimbro during the meeting. According to Kimbro, the settlement reached with Leonida included $540 for the first two weeks of lost wages that were not covered by PIP and $2,000 for her remaining claims, such as pain and suffering and disfigurement. He testified that she initially asked for more and that on two occasions he countered and left the room so that the three women could discuss his offer.

Once an amount was agreed to by each of the women to settle their claims, Kimbro prepared releases which released all liability claims of the women. Kimbro then

reviewed and explained the releases to the women. He assumed Priscilla's translation to Leonida was correct. Priscilla testified that she understood and explained to Leonida that Leonida's release was for lost wages and pain and suffering. Leonida was asked if she had any questions before signing the release. In response, she said only "okay" and signed the release. RP (Apr. 4, 2002) at 96. Leonida did not "bother asking" any questions about its contents before signing.[3]

However, Leonida testified that she believed the release was limited to her lost wages claim. She also believed that the $2,000, in addition to the $540 representing wages already lost, was for future lost wages. Leonida separately received PIP benefits for her lost wages after the first two weeks and PIP benefits covering all of her medical bills related to the accident.[4]

Approximately two months before the running of the three year statute of limitations, Leonida filed suit against Gene and Priscilla for her injuries. The couple responded with an affirmative defense: her signed release. Gene and Priscilla also moved for summary judgment. Initially, the trial court granted the couple's motion for summary judgment and entered an order dismissing Leonida's claims with prejudice. Leonida moved the trial court for reconsideration, which was granted. The trial court reversed its earlier ruling and denied the couple's summary judgment motion. State Farm is not a party to this suit.[5]

---

[3] Specifically, Leonida testified:

Q.   Did you read the document that you signed?

A.   No.

Q.   Did you ask Priscilla to tell you what the document meant?

A.   I did not bother asking anymore.

RP (Apr. 3, 2002) at 55-56.

[4] Leonida received a total of $5,604.21 in PIP benefits: $4,027.65 for medical expenses and $1,576.56 for lost wages. Clerk's Papers (CP) at 43-44.

[5] We emphasize that State Farm is not a party to this action. Thus, the issues of whether State Farm properly discharged its duty to inform first party claimants of all available benefits and coverages or whether State Farm owed an enhanced

At the close of trial, Gene and Priscilla proposed several jury instructions regarding the validity of releases. Gene and Priscilla essentially asked the court to instruct the jury that a release is binding where the injuries are known, unless there is clear, cogent, and convincing evidence that the release was induced by fraud, misrepresentation, over-reaching, or undue influence, or if there was a mutual mistake by the parties. The trial court refused to give the couple's proposed instructions. Instead the trial court instructed the jury, according to Leonida's proposed instruction, that "[a] release should be set aside if it was not fairly and knowingly made." Clerk's Papers (CP) at 361. The jury returned a special verdict concluding the release was not fairly and knowingly made. The jury also awarded Leonida $21,600 in damages in addition to the $2,540 she received with her release and the $5,604.21 she received in PIP benefits.

Gene and Priscilla appealed. First, Division One held the trial court committed error by instructing the jury on the *Finch* fairly and knowingly made exception "[b]ecause this case does not involve unknown injuries." *Del Rosario*, 116 Wn. App. at 895. Second, Division One created a new rule for the validity of releases signed by non-English reading persons and held that if a jury found that Leonida reasonably relied on an erroneous translation or explanation of the release, she may avoid the release. *Id.* at 895, 898, 900. Accordingly, the case was remanded for trial with appropriate jury instructions based upon Division One's new rule. *Id.* at 901.

Leonida sought discretionary review of the Court of Appeals' reversal of the judgment in her favor and its adoption of a new rule that was not advocated by either party. While Gene and Priscilla did not seek review, they

duty of good faith to Leonida, its own insured, while handling her third party claims are not before the court. *See* WAC 284-30-350 (requiring full disclosure to first party claimants of all pertinent benefits and coverages); *see also Heigis v. Cepeda*, 71 Wn. App. 626, 631-32, 862 P.2d 129 (1993) (holding there is no enhanced duty of good faith owed by an insurer when dealing with its own insured as a third party claimant).

asked that, if review were granted, we reject the new test adopted by the Court of Appeals. We accepted discretionary review.

## ANALYSIS

### STANDARD OF REVIEW

■ ■ "Alleged errors of law in jury instructions are reviewed de novo." *Blaney v. Int'l Ass'n of Machinist & Aerospace Workers, Dist. No. 160*, 151 Wn.2d 203, 210, 87 P.3d 757 (2004). "Jury instructions are proper when they permit the parties to argue their theories of the case, do not mislead the jury, and *properly inform the jury of the applicable law*." *Id*. (emphasis added). We must first determine the applicable law.

### APPLICABILITY OF THE *FINCH* FAIRLY AND KNOWINGLY MADE EXCEPTION

■ This court has consistently held that personal injury releases are contracts governed by contract principles. *See Beaver v. Estate of Harris*, 67 Wn.2d 621, 627-28, 409 P.2d 143 (1965) (holding release must be sustained unless induced by fraud, false representations, or overreaching, or a mutual mistake is clearly established); *accord Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 187, 840 P.2d 851 (1992). Generally, we are loath to vacate properly executed releases because Washington favors finality in private settlements. *See generally Bennett v. Shinoda Floral, Inc.*, 108 Wn.2d 386, 739 P.2d 648 (1987).

However, Washington also favors just compensation of accident victims. We have accordingly recognized an exception to the general rule. A release may be avoided if (1) there is an unknown or latent injury discovered after the release was executed and (2) the plaintiff proves the release was

not fairly and knowingly made.[6] *Finch*, 84 Wn.2d at 145-46. Subsequent cases have turned on the scope of the exception announced in *Finch*, and we have consistently applied the exception to circumstances where there were unknown or latent injuries at the time the release was executed. *See Bennett*, 108 Wn.2d 386; *see also Nevue v. Close*, 123 Wn.2d 253, 867 P.2d 635 (1994).

In *Bennett*, we considered whether the *Finch* exception applied to determine the validity of a release when, at the time of execution, the injuries were known, but the extent or consequences of the injuries were not. *Bennett*, 108 Wn.2d at 388. In order to properly maintain balance between the policies favoring private, final settlements, and just compensation of accident victims, we concluded "that *Finch* must be limited to its facts." *Id.* at 394. Thus, if the injuries were known at the time of execution, the fairly and knowingly made test was not applicable to determine the validity of the release. *Id.* at 396.

Next, we considered the applicability of the *Finch* exception when some injuries were known at the time of execution but other unknown or latent injuries were discovered after execution of the release. *Nevue*, 123 Wn.2d 253. Again, the *Finch* exception to general contract principles was limited to situations in which there were unknown injuries at the time the release was executed. While adhering to our prior decisions that releases are binding as to known injuries, we clarified that releases may be avoided as to any injuries which are unknown or latent at the time of execution when the release was not fairly and knowingly made. *Id.* at 258.

We adhere to our prior decisions limiting the applicability of the *Finch* fairly and knowingly made exception to circumstances in which there were unknown or latent injuries at the time the release was executed. Leonida does not claim she suffered from any unknown or latent injuries. In

---

[6] Whether the release was fairly and knowingly made is a question of fact, which often precludes entry of summary judgment. *E.g.*, *Finch*, 84 Wn.2d at 146 and *Nevue v. Close*, 123 Wn.2d 253, 258, 867 P.2d 635 (1994).

fact, she concedes all her injuries were known at the time she signed the release. Accordingly, we affirm the Court of Appeals' holding that the trial court erred by instructing the jury on the *Finch* exception.

ADOPTION OF A NEW RULE

Although this is not a case involving unknown or latent injuries, it does present a factual scenario for which traditional contract principles may not be adequate. Here, State Farm, which provided Leonida's PIP coverage, prepared a release in the English language. State Farm's agent knew that Leonida could not read English. Priscilla, one of the released parties, also knew that Leonida could not read English and undertook to explain the meaning of the document to Leonida.

In a similar situation involving a release negotiated by Yakima County with a man who had very limited reading skills, Division Three applied the *Finch* exception to ameliorate any unfairness to the non-English reading releaser. *Hooper v. Yakima County*, 79 Wn. App. 770, 904 P.2d 1193 (1995). The trial court below relied upon *Hooper* to apply the *Finch* fairly and knowingly made exception to the instant facts. As discussed above, we hold the *Finch* exception is not applicable except in circumstances involving unknown or latent injuries.[7]

In this case, the Court of Appeals looked to other jurisdictions and concluded that a release could be avoided by a person who could not read the release and "reasonably relied on another's erroneous translation or explanation of [the release]." *Del Rosario*, 116 Wn. App. at 898. The Court of Appeals relied on cases from Arizona, Georgia, New Jersey, and New York to fashion its newly articulated rule. *Id.* at 896-97. The Court of Appeals also directed that several other jury instructions be given in conjunction with

---

[7] Any language to the contrary in *Hooper* is disapproved.

its new rule.[8] Because the rule announced by Division One was not proposed below, was not advanced by either party, and was not thoroughly briefed, we decline to reach it at this time.[9] *See Hanson v. City of Snohomish*, 121 Wn.2d 552, 557, 852 P.2d 295 (1993) (noting issues and theories not presented to the trial court are generally not considered on review).

Washington adheres to the general contract principle that parties have a duty to read the contracts they sign. *Nat'l Bank of Wash. v. Equity Investors*, 81 Wn.2d 886, 912, 506 P.2d 20 (1973). We will not casually depart from this principle, which imposes some responsibility on those who sign contracts. If departure from Washington's basic contract principles is required, that departure will have to wait for another case.

---

[8] The Court of Appeals directed:

> On remand, the trial court should instruct the jury that a release is valid unless shown to be invalid by clear, cogent, and convincing evidence. The court should also instruct the jury that a person who signs a contract written in a language he or she does not understand has a duty to take reasonable steps to have the contract translated or explained. The court should further instruct the jury that a person who is unable to read a contract and relies on another's erroneous translation or explanation of it may avoid the contract unless the signer has been negligent.

*Del Rosario*, 116 Wn. App. at 901.

[9] If such a rule is required, a broad articulation, which allows avoidance of releases based upon any erroneous translation or explanation, may not be warranted. Rather a rule limited to circumstances where the released party provided an erroneous translation may be sufficient to balance the competing interests. We also recognize there may be better alternatives available. In passing, we note as of 2002, at least 190 languages were spoken in Washington because that is the number of languages spoken by children in the State's public school system. *See* TERRY BERGESON, OFFICE OF SUPERINTENDENT OF PUB. INSTRUCTION, EDUCATING ENGLISH LANGUAGE LEARNERS IN WASHINGTON STATE 2 (Annual Report of the State Transitional Bilingual Instruction Program 2003). We also note the Department of Licensing provides driver manuals and other forms in Chinese, Korean, Japanese, Russian, Spanish, and Vietnamese. *See* www.dol.wa.gov/ds/foreign.htm (last visited Sept. 2, 2004). Consequently, it may be reasonable for the legislature or the insurance commissioner to require insurance companies to translate releases into certain commonly used languages and to promulgate appropriate methodologies for further translations as needed.

ISSUES OF MISREPRESENTATION, OVERREACHING, AND UNDUE
INFLUENCE

■ At trial, Leonida argued fraud, misrepresentation, overreaching, and undue influence in the manner in which her signature on the release was obtained. Leonida contends that she was told by Priscilla that the release and check were only for lost wages. Priscilla contends that she told Leonida that the check and release was for lost wages and pain and suffering.[10] Both parties offered jury instructions on the issues of fraud, misrepresentation, undue influence, and overreaching.[11] However, the trial court, relying on *Hooper*, erroneously gave the *Finch* exception's fairly and knowingly made instruction instead. *See* CP at 349-66 (court's instructions to the jury). Consequently, the jury was not instructed on and did not decide the material questions of fact presented by the traditional contract issues raised by the parties. Therefore, we must remand for retrial on the issues of fraud, misrepresentation, overreaching, and undue influence advanced by the parties.

---

[10] Priscilla testified:

Q. Now the amount on [Leonida's release] is $2,540. Did you have an understanding from sitting there as to what the $540 was for?

A. For her wage loss and pain and suffering.

RP (Apr. 4, 2002) at 94.

Q. When you explained it to her did you tell her this was for her pain and suffering?

A. That is true.

RP (Apr. 4, 2002) at 95.

A. I just explain to her what [the release] was saying, and she seemed to understand my explanation and she says okay. And that is what I told Mr. Kimbro.

RP (Apr. 4, 2002) at 97.

Q. So you told [Leonida] that the entire check, $2,540, that was all wages?

A. For wage loss and her pain and suffering.

RP (Apr. 4, 2002) at 113.

[11] CP at 325 (plaintiff's proposed instruction regarding general validity of release); CP at 418 (defendants' proposed instruction on same); CP at 324 (plaintiff's proposed instruction regarding undue influence); CP at 425 (defendants' proposed instruction on same); CP at 420 (defendants' proposed instructions regarding fraud); CP at 423 (defendants' proposed instruction regarding overreaching).

## CONCLUSION

We affirm the Court of Appeals' holding that it was improper for the trial court to give a *Finch* fairly and knowingly made exception instruction. We decline to reach the issue of whether a new rule should be adopted to determine the validity of releases that are written in English and signed by non-English readers. Accordingly, that portion of the Court of Appeals' opinion is reversed. We remand for retrial on any traditional contract theories that were advanced by the parties below.

ALEXANDER, C.J., and JOHNSON, MADSEN, SANDERS, IRELAND, BRIDGE, OWENS, and FAIRHURST, JJ., concur.